USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/13/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------X
                              :
SECURITIES AND EXCHANGE       :      94 CV 5737 (LAP)
COMMISSION,                   :
                              :      MEMORANDUM & ORDER
            Plaintiff,        :
                              :
     v.                       :
                              :
HAROLD GLANTZ,                :
                              :
            Defendant.        :
                              :
------------------------------X

MAILED TO COUNSEL

LORETTA A. PRESKA, Chief United States District Judge:

    Plaintiff, the Securities and Exchange Commission ("Plaintiff" or the "SEC"), brings this motion seeking summary judgment against Defendant Harold Glantz ("Glantz") with respect to Plaintiff's claim that Glantz violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (the "Securities Act"), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), (the "Exchange Act") and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, permanently enjoining Glantz from future violations of the above antifraud provisions, and assessing an appropriate civil penalty against Glantz under Sections 20(d) of the Securities Act and 21(d)(3) of the Exchange Act. For the reasons set forth herein, Plaintiff's motion is GRANTED.

I.  BACKGROUND[1]

Between the end of 1991 through March 1994, Glantz, together with Peter Block ("Block"), induced investments through Glantz's company, Continental Capital Markets, Inc. ("CCMI") and Block's company, Severn Investments, Ltd. ("Severn"), for the purported purpose of purchasing, selling, or trading Prime Bank instruments. (SEC 56.1 Stmt. ¶ 5.) Glantz promised investors that the investments would yield rates of return between 18-37.5% with no risk. (Id.) Two investors, Jeffrey M. Cantwell ("Cantwell"), on behalf of his company, JMC Enterprises, Inc. ("JMC"), and Warren H. Bradley ("Bradley"), on behalf of the pension plan of his company, Cardinal Systems, Inc. ("Cardinal"), each invested $1 million. (Id.)

    A.  The Cantwell Investment

---

[1] The following facts are drawn from the SEC's Statement Pursuant to Local Civil Rule 56.1(a) ("SEC 56.1 Stmt."). Glantz failed to respond to the motion for summary judgment and did not file a document containing "a correspondingly numbered paragraph responding to each numbered paragraph" in Plaintiff's Statement of Material Facts, as is required by Local Civil Rule 56.1(b). Therefore, the facts contained in Plaintiff's Statement of Material Facts are deemed admitted for purposes of this motion. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 72 (2d Cir. 2001); see also Galasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 574 (S.D.N.Y. 2004).

In early 1992, Glantz and Block spoke with Cantwell and told him that the investment involved the purchase of Prime Bank notes at a discount with their subsequent and immediate sale in Europe at a higher rate, thereby creating a profit. (Id. ¶ 6.)  Glantz told Cantwell that the money he invested would be used as collateral by the purchasing bank and, therefore, would never leave the bank. (Id.) Glantz also promised an investment return of 35% per year. (Id.)  On March 18, 1992, Cantwell, on behalf of JMC, entered into an agreement with Glantz (through CCMI) whereby: (1) JMC would deposit $1 million in an account at Swiss Bank Corporation ("SBC"); (2) the funds could only be used to create a credit line for the purchase and sale of one year, zero interest credit instruments; and (3) CCMI would make weekly interest payments to JMC on the $1 million deposit at a rate of 35% per year. (Id. ¶ 7.)

On March 23, 1992, Cantwell opened a corporate account in the name of JMC at SBC and gave CCMI power of attorney over the account. (Id. ¶ 8.)  Two days later, Cantwell wired $1 million into the JMC account. (Id.)  Between July 1992 and January 1993, Cantwell did not receive any additional interest payments, and when he questioned Block, Block told Cantwell that Glantz was having difficulty trading the instruments. (Id. ¶ 11.)  Despite Cantwell's

3

repeated requests to have his money returned, Glantz refused, maintaining that he was about to commence trading with the investment proceeds. (Id. ¶ 12.) Glantz, however, had no intention of trading with the funds because he had already used Cantwell's investment for his own personal use. (Id.)

    B.   The Bradley Investment

In or about November and December 1992, Block spoke to Bradley and described the investment program described above through which Cardinal could earn an 18% annual rate of return. (Id. ¶ 13.) Block informed Bradley that Cardinal's investment was safe and would be used to purchase a certificate of deposit which would thereafter be used as leverage for further investments. (Id. ¶ 14.) On December 1, 1992, Bradley received an investment agreement whereby (1) Cardinal's funds would be used exclusively to obtain a credit line for the purchase and sale of one-year zero interest letters of credit; (2) Cardinal would be paid interest at a rate of 18% per annum, with payments to be made monthly; and (3) the principal would be returned after one-year. (Id. ¶ 15.) Upon executing the agreement, Bradley transferred $40,874.05 in Cardinal's funds to Severn's account at Barclays Bank in Nassau, Bahamas, on

4

December 11, 1992, and $959,125.95 to CCMI's account at Citibank in New York on December 15, 1992. (Id. ¶ 16.)

On January 6, 1993, Glantz confirmed receipt of Cardinal's $1 million in a letter to Severn. (Id. ¶ 17.) Glantz never invested these funds because he misappropriated them for his personal use. (Id.) From February 1993 to February 1994, neither Bradley nor Cardinal received any interest payments. (Id.) On or about March 1, 1994, Glantz ordered the wire transfer of $1 million from a client trust account held on his behalf by his attorneys to Cantwell's personal bank account. (Id. ¶ 20.) On March 17, 1994, Glantz sent a certified check for $1 million from his Kantor Davidoff account to Severn, and on March 18, 1994, Severn faxed a letter to Bradley notifying him of the receipt of $1 million representing the return of 100% of the principal amount invested with CCMI. (Id. ¶ 21.) On March 28, 1994, $1 million was wired from Severn's bank account at Barclays Bank to Cardinal's account. (Id.) Glantz caused $2 million to be taken from funds raised in another, unrelated Prime Bank fraud, to satisfy his obligations to Cantwell and Bradley. (Id. ¶ 22.)

In sum, based on Glantz's misleading oral and written statements and material omissions of fact, Glantz and Block

5

raised $2 million from Cantwell and Bradley.  (Id. ¶ 23.) These funds were never used to obtain credit lines to buy, sell, or trade Prime Bank instruments; instead, Glantz spent Cantwell's and Bradley's money for his own personal benefit. (Id.)  Glantz misled Cantwell regarding SBC's agreement to create a line of credit, and he also misrepresented the risks associated with Cantwell's and Bradley's investments as well as the ability of the investment to generate the promised rates of return. (Id. ¶ 24.)

    C.    <u>Glantz's Guilty Plea</u>

At his August 13, 1997 plea hearing, Glantz pleaded guilty to participating in fraudulent investment schemes whereby he falsely represented to investors that he was in the business of trading in Prime Bank instruments and discounted letters of credit, that he could buy these at a discount, and that he subsequently would sell and/or trade them for a profit. (Id. ¶ 26.)  Glantz further admitted that he fraudulently represented that he had connections with the prime banks in Europe and had been successfully conducting these trades for a number of years. (Id.) Lastly, Glantz admitted that he fraudulently represented that investor's funds would be secured in their accounts and would remain there, except under circumstances where

they would be substituted with a Prime Bank instrument, or some evidence of such, in an amount equal to their investment. (Id.)

Glantz was convicted of conspiracy to commit wire fraud and wire fraud, was sentenced to forty-six months incarceration, three years supervised release, and was ordered to pay restitution in the amount of $21,883,185. (Id. ¶ 27.)

II. DISCUSSION

    A.    Summary Judgment Standard

The SEC will prevail on its motion only "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [the SEC is] entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" Overton v. New York State Div. of Military and Naval Affairs, 373 F.3d 83, 89 (2d Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In assessing whether a

genuine issue of material fact exists, a court must examine the evidence in the light most favorable to the nonmoving party. Lucente v. IBM Corp., 310 F.3d 243, 253 (2d Cir. 2002).

When a nonmoving party fails to respond to a motion for summary judgment, "the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 242 (2d Cir. 2004). "'If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.'" D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (quoting Vermont Teddy Bear Co., 373 F.3d at 244)).

B.  Collateral Estoppel

Once an issue of law or fact necessary to a judgment has been previously decided, the doctrine of collateral estoppel precludes the "relitigation of [that same issue] in a suit on a different cause of action involving a party to the first case." Burgos v. Hopkins, 14 F.3d 787, 789 (2d Cir. 1994) (citation omitted). Collateral estoppel precludes relitigation when "(1) the issues in both proceedings are identical, (2) the issue in the prior

8

proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." NLRB v. Thalbo Corp., 171 F.3d 102, 109 (2d Cir. 1999); see also Fuchsberg & Fuchsberg v. Galizia, 300 F.3d 105, 109 (2d Cir. 2002).

"It is well-settled that a criminal conviction, whether by a jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by judgment in the criminal case." United States v. Podell, 572 F.2d 31, 35 (2d Cir. 1978); see also United States v. U.S. Currency in the Amount of $119,984, 304 F.3d 165, 172 (2d Cir. 2002) (same). The Court of Appeals has explained the reasoning behind this rule as follows:

> The Government bears a higher burden of proof in the criminal than in the civil context and consequently may rely on the collateral estoppel effect of a criminal conviction in a subsequent civil case. Because mutuality of estoppel is no longer an absolute requirement under federal law, a party other than the Government may assert collateral estoppel based on a criminal conviction. The criminal defendant is barred from relitigating any issue determined adversely to him in the criminal proceeding, provided that he had a full and fair opportunity to litigate the issue.

Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 43 (2d Cir. 1986) (citations omitted). The fact that Glantz pleaded guilty to wire fraud, as opposed to securities fraud, does not preclude the application of collateral estoppel. In SEC v. Dimensional Entm't Corp. et al., the district court correctly observed that while the statutory violations of wire fraud and securities fraud differ, "the factual allegations underlying the wire fraud convictions are sufficient to establish that [the defendant] also violated the securities laws provisions at issue here." 493 F. Supp. 1270, 1277 (S.D.N.Y. 1980). Accordingly, so long as Glantz's conviction by guilty plea establishes the requisite elements of securities fraud, Glantz is estopped from challenging his liability under Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act.

    C.    Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

To prove a violation of Section 10(b) and Rule 10b-5, the SEC must show that Glantz "(1) in the offer or sale, or in connection with the purchase or sale, (2) of securities, (3) made untrue statements of material fact or omitted disclosure of material fact, (4) with scienter." SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 327 (S.D.N.Y. 2007) (citing Basic, Inc. v. Levinson, 485 U.S. 224 (1988)).

Glantz's plea establishes each of these elements.[2] Glantz acknowledged that that he solicited Cantwell and Bradley to invest $1,000,000 each for the purpose of obtaining credit lines to buy, sell, or trade Prime Bank instruments. (See Byrne Decl., Ex. 4 ¶ 54.) Glantz did not intend to follow through on his representations but instead used the funds for his own personal use. (Id. ¶¶ 53, 59.) Glantz admitted to knowingly perpetrating this fraudulent scheme. (Id. ¶ 68.) Glantz's guilty plea to counts 27 through 30 of the indictment establishes a violation of both Section 10(b) and Rule 10b-5 of the Exchange Act. Accordingly, the SEC's motion for summary judgment on as to Glantz's liability under Section 10(b) and Rule 10b-5 of the Exchange Act is GRANTED.

   D.   Violation of Section 17(a) of the Securities Act

"Section 17(a) of the Securities Act is a general prohibition against fraud in the offer or sale of securities, using the mails or the instruments of interstate commerce." SEC v. McCaskey, No. 98 Civ. 6153, 2001 WL 1029053, *4 (S.D.N.Y. Sept. 6, 2001); see 15 U.S.C. § 77q(a). The Court of Appeals has held that "[e]ssentially the same elements are required under Section

---

[2] Glantz pleaded guilty to counts 1 through 30 of the indictment. (See Declaration of Kenneth Byrne ("Byrne Decl."), Ex. 6 at 6.)

11

17(a)(1)-(3) in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)." SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999). As set forth more fully above, Glantz's guilty plea to the wire fraud counts established his violation of Section 10(b) and Rule 10b-5, and, since the elements of Section 10(b) and Rule 10b-5 of the Exchange Act are "essentially the same" as the elements of Section 17(a) of the Securities Act, Glantz's guilty plea establishes his liability under Section 17(a). See also SEC v. Gallard, No. 95 Civ. 3099, 1997 WL 767570, *3 (S.D.N.Y. Dec. 10, 1997) (finding that since the record established that the [prime bank instruments] that defendants purported to sell did not exist, it is but a simple step to conclude that their activities violated the antifraud [provisions of the securities laws]."). Accordingly, the SEC's motion for summary judgment as to Glantz's liability under Section 17(a) of the Securities Act is GRANTED.

III. REMEDIES

The SEC seeks the following remedies: (1) a permanent injunction enjoining Glantz from future violations of the antifraud provisions of the securities laws, and (2) a

civil monetary penalty.  "Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies . . . ."  <u>SEC v. First Jersey Secs., Inc.</u>, 101 F.3d 1450, 1474 (2d Cir. 1996).

    A.   <u>Permanent Injunction</u>

Both the Exchange Act and the Securities Act "provide for the issuance of permanent injunctive relief in the face of a violation of any of their provisions."  <u>McCaskey</u>, 2001 WL 1029053, at *5; <u>see</u> 15 U.S.C. § 77t(b); 15 U.S.C. §§ 78u(d)(e), 78u-1.  A permanent injunction is appropriate upon a showing that a defendant has violated the securities laws and that there is a reasonable likelihood of future violations.  <u>See</u> <u>SEC v. Commonwealth Chem. Sec., Inc.</u>, 574 F.2d 90, 99 (2d Cir. 1978).  Because the Court has already granted summary judgment in favor of the SEC finding that Glantz violated the securities laws, the only remaining inquiry is whether there is a reasonable likelihood of future securities violations.  In making this determination, a district court may consider: (1) "the fact that the defendant has been found liable for illegal conduct"; (2) "the degree of scienter involved"; (3) "whether the infraction is an 'isolated occurrence'"; (4) "whether defendant continues to maintain that his past conduct was blameless"; and (5) "whether, because of his

13

professional occupation, the defendant might be in a position where future violations could be anticipated." SEC v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998) (quoting Commonwealth Chem. Sec., Inc., 574 F.2d at 100).

The Court finds these factors weigh decidedly in favor of issuing the injunction. First, Glantz's fraudulent scheme caused more than $20 million in losses for his victims. (See Byrne Decl., Ex. 5 at 2.) Glantz acted willingly and knowingly, and the scheme was not the result of one isolated incident but instead lasted more than two years. (See Byrne Decl., Ex. 4 ¶ 68.) Finally, as the SEC points out in its Memorandum of Law in Support of its Motion for Summary Judgment, Glantz's age (he is now over seventy years old) did not have a deterrent effect, as he perpetrated these violations in his sixties. Accordingly, because there is a reasonable likelihood that, unless enjoined, Glantz will commit future violations of the federal securities laws, the SEC's request for a permanent injunction is GRANTED.

B. Civil Penalties

Civil penalties are "designed to punish the individual violator and deter future violations of the securities laws." SEC v. Haligiannis, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (citing SEC v. Moran, 944 F. Supp. 286,

14

296 (S.D.N.Y. 1996)). Courts look to a number of factors to determine whether a fine should be imposed, including "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." Id. (citing SEC v. Coates, 137 F. Supp. 2d 413, 429 (S.D.N.Y. 2001)). The penalties range from $5,000 (see 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i)) to the greater of $100,000 or the gross amount of pecuniary gain to the defendant (see §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii)).

Here, the Court has already considered most of these factors in granting the SEC's request for a permanent injunction and finds that they weigh heavily against Glantz and in favor of civil penalties. Glantz's scheme resulted in the loss of tens of millions of dollars by a large number of victims through a fraudulent scheme perpetrated over two years. He knowingly and willfully defrauded his victims and used the proceeds for his own personal benefit. The SEC has not requested a specific penalty, nor has it provided this Court with an exact amount of Glantz's ill-

gotten gains. Accordingly, this Court shall impose $200,000 in civil penalties. This amount reflects a $100,000 penalty for each of Glantz's victims as set forth in the SEC's complaint in this action (i.e., Cantwell and Bradley).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [dkt. no. 28] is GRANTED. Defendant is permanently enjoined from future violations of the federal securities laws and is ordered to pay a civil penalty in the amount of $200,000 pursuant to Section 20(d) of the Securities Act and 21(d) of the Exchange Act.

SO ORDERED:

Dated: October 12, 2009

*Loretta A Preska*
LORETTA A. PRESKA, Chief U.S.D.J.